ELMORE, Judge, dissenting.
I respectfully disagree with the majority's conclusions that the trial court did not err in denying defendant's motion to suppress. As a result, I would reverse the trial court's order denying defendant's motion to suppress, vacate the judgment, and remand to the trial court.
The majority concludes that the facts in defendant's case support the trial court's finding that the officer had a reasonable articulable suspicion to extend the scope of the initial stop to allow a canine search of defendant's vehicle. I disagree. The majority recognizes that when an individual's presence in a suspected high crime area is coupled with evasive action, law enforcement may form reasonable suspicion from the evasive actions. Willis, supra. As such, the majority concludes that *502 the facts in In re I.R.T., are analogous to those facts in the case at hand. In re I.R.T, 184 N.C.App. 579, 581-83, 647 S.E.2d 129, 132-33 (2007). I disagree.
In I.R.T., the officer testified that when he approached the juvenile in a high crime area, he witnessed the juvenile "quickly turned his head away" from him. Id. at 585, 647 S.E.2d at 135. Further, the officer testified that the juvenile "kept his head turned away from [him] and ... [the officer] could tell that he was not moving his mouth [while responding to the officer's questions] as though he had something inside of his mouth." Id. at 585-86, 647 S.E.2d at 135. The officer alleged that "individuals that have exhibited those characteristics have generally kept crack-cocaine in their mouths." Id. at 586, 647 S.E.2d at 135. Importantly, suspecting the juvenile of hiding drugs in his mouth, the officer requested that the juvenile spit out what was in his mouth. Id. at 581, 647 S.E.2d at 132. The juvenile spit out crack cocaine wrapped in cellophane. Id. This Court discerned that the juvenile's "turning away from the officer and not opening his mouth while speaking constituted evasive actions", and we accordingly held that the juvenile's evasive conduct, presence in a high crime area, and the officer's training was sufficient to establish reasonable suspicion. Id. at 586, 647 S.E.2d at 135.
The I.R.T. Court relied, in part, on State v. Watson, 119 N.C.App. 395, 458 S.E.2d 519 (1995). In Watson, this Court found reasonable suspicion to justify an investigatory seizure when police approached a convenience store located in a high crime area and witnessed the defendant make "evasive maneuvers to avoid detection, i.e., putting the drugs in his mouth, attempting to swallow the drugs by drinking Coca-Cola and attempting to go into the store." Id. at 398, 458 S.E.2d at 522. The defendant "was ordered to spit out the objects in his mouth[.]" Id. at 396-97, 458 S.E.2d at 521. When the defendant refused, the officer applied pressure to the defendant's throat and he spit out three baggies of crack cocaine. Id at 397, 458 S.E.2d at 519.
I agree with this Court's holdings in both I.R.T. and Watson. Not only were the defendants present in high crime areas, each acted evasively when confronted by law enforcement. However, the facts in I.R.T. and Watson are markedly different from the facts in the case before us.
Here, there is no question that the officer stopped defendant in a high crime area for a traffic violation. Upon finding defendant's license and registration to be valid and that the car was registered to defendant, the officer issued defendant a warning ticket. The officer began writing the warning ticket while standing at defendant's driver side door.
*503 The officer talked to defendant when he wrote the ticket. In speaking with defendant, the officer alleged that he thought defendant had something in his mouth. The following colloquy occurred at trial:
DEFENSE COUNSEL: You said [defendant] had something in his mouth and he wasn't chewing on it?
OFFICER: Correct.
DEFENSE COUNSEL: Was it peppermint?
OFFICER: I don't know.
DEFENSE COUNSEL: Well, was there some other type of hard candy?
OFFICER: I don't know.
*368 DEFENSE COUNSEL: Did you see any type of plastic or anything coming out the corner of [defendant's] mouth that would indicate that it was some type of packaging[?]
OFFICER: No.... Just something in his mouth. I couldn't tell.
DEFENSE COUNSEL: Okay. And that caused you concern?
OFFICER: I notated.
Defense counsel asked the officer, "[w]hile you're writing the warning ticket, you are engaged in conversation with [defendant]?" The officer replied, "[y]es, sir." Defense Counsel asked, "[h]e engages in conversation back with you?" The officer replied, "[h]e does." The record shows that during their conversation, the officer informed defendant that he was stopped in a high crime area and pointed out to defendant that the Berkshire Apartments were known for their drug activity. The officer asked defendant if he was on probation, and defendant answered that he was not. The officer asked if defendant had any prior drug offenses, and defendant said "he wasn't involved in that type of stuff anymore." Defendant informed the officer that he was self-employed in landscaping. Defense counsel asked the officer whether the object remained in defendant's mouth during the conversation, and the officer answered in the affirmative. Defense counsel questioned, "[y]ou don't ask him about [the object]?" The officer replied, "[t]hat's correct."
The officer admitted that the traffic stop turned into a drug investigation solely because defendant was in a known drug area and because defendant had an unidentified object in his mouth. Defense counsel *504 questioned, "the only thing that concerned you was some object that was in [defendant's] mouth that you were unable to identify?" The officer replied, "[a]lso, the area that he was coming from of course." While the officer was writing the warning citation, he asked defendant if there was anything illegal in his vehicle. The officer asked defendant if he could check his vehicle for narcotics, and defendant said no. The officer then asked defendant to step out of his vehicle so he could search defendant's person for "guns, drugs, or other weapons." The officer testified that defendant consented to the search-he "didn't ... resist the search at all." Further, the search yielded nothing illegal or suspicious.
Notably, defense counsel asked, "[y]ou have consent to search his entire person, do you believe that?" The officer replied, "[y]es, I do." Defense counsel questioned, "[b]ut you do not search his mouth?" The officer admitted, "[t]hat's correct." After finding no evidence of contraband on defendant's person, and not searching defendant's mouth, the officer continued to detain defendant as he called for backup. When a second officer arrived, he was instructed to finish writing the warning citation while the first officer conducted the canine sniff of defendant's vehicle. It was not until after the canine sniff test was completed that the officer searched defendant's mouth. The officer alleged that defendant appeared to swallow something.
These facts, taken in totality and viewed through the eyes of a reasonable, cautious officer, do not support the trial court's finding that the officer had reasonable suspicion to justify extending the traffic stop. Unlike in I.R.T. and Watson, where the defendants took evasive actions to avoid law enforcement, the record here shows that defendant did not act evasively. Specifically, defendant engaged in a conversation with the officer during which he was able to speak clearly enough to inform the officer that he was not on probation and worked in landscaping. Additionally, defendant "didn't ... resist the search [of his person] at all." Further, defendant allowed the officer to check his license and registration, which were in good standing. In doing so, the officer returned to his patrol vehicle, and defendant would have had an opportunity to spit out what was allegedly in his mouth. Finally, the officer testified that defendant was "polite" and there were no "issues" with the traffic stop.
Of upmost importance in this case, the officer did not search defendant's mouth during the search of his person. Moreover, the officer admittedly never questioned defendant about the alleged unknown item in his mouth until after the canine sniff. Nonetheless, *369 the majority points to the officer's six years of experience in narcotics detection as well as his belief that defendant was concealing something in his mouth to *505 support a finding of reasonable suspicion. Arguably, an experienced officer would take steps to determine what, if anything, was in a person's mouth at the outset of a stop when such a suspicion was the basis for the search of that person.
Because the officer neither questioned defendant about having an item in his mouth nor did he search defendant's mouth, I find it highly objectionable that the purported evasive conduct that essentially tipped the scale in favor of finding reasonable suspicion was the officer's mere alleged suspicion that defendant had an unknown object in his mouth. Had the officer taken any steps to confirm his suspicion, a canine search of defendant's vehicle would debatably have been permissible based upon reasonable suspicion. Egregiously, the officer neglected to investigate his suspicion, yet still felt justified in prolonging the stop to conduct a canine sniff of the outside of defendant's vehicle. Notably, the officers in I.R.T. and Watson both demanded that the defendants spit out what was hidden in their mouths as part of the investigatory stop.
To me, these facts suggest that the officer was acting on no more than an "unparticularized suspicion or hunch" that defendant's vehicle contained contraband based on defendant's presence in a high crime area. State v. Brown, 217 N.C.App. 566, 572, 720 S.E.2d 446, 450 (2011) writ denied, review denied, 365 N.C. 541, 742 S.E.2d 187 (2012) (citation and quotation omitted). It is well established that a suspicion or hunch is insufficient to form the basis of reasonable suspicion. Id. Because the facts of this case do not support a finding that the officer had reasonable suspicion to believe that criminal activity was afoot to justify the extension of the traffic stop, I respectfully disagree with the majority's opinion.
Because the officer lacked reasonable suspicion, under Rodriguez, the question for this Court becomes whether the officer unlawfully prolonged an otherwise completed traffic stop in order to conduct a canine sniff outside of defendant's vehicle. Again, an officer may conduct certain unrelated checks during an otherwise lawful traffic stop, so long as he does so in a way that does not prolong the stop. Rodriguez v. United States, --- U.S. ----, ----, 135 S.Ct. 1609, 1614-15, 191 L.Ed.2d 492, 499 (2015). The unrelated checks include: checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. Id. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. However, "[l]acking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." Id.
*506 In Rodriguez, the Supreme Court framed the "critical" question as "not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff adds time to the stop" Id. at ----, 135 S.Ct. at 1612, 191 L.Ed.2d at 496. As the Supreme Court opined, "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete [the stop's] mission." Id. at ----, 135 S.Ct. at 1618, 191 L.Ed.2d at 499 (citation and quotation omitted) (alteration in original). A traffic stop prolonged beyond that point is unlawful. Id.
The majority contends that "it is unclear from the trial court's findings whether the execution of the dog sniff prolonged the traffic stop." I disagree. In the instant case, the officer's actions inevitably prolonged the traffic stop beyond the amount of time reasonably required to complete the stop's mission. After checking defendant's license and registration and confirming that the vehicle was registered to defendant, the officer stood by defendant's door and began issuing him a warning ticket. The officer could have reasonably completed writing the citation in a matter of one to two minutes. However, the officer struck up a conversation with defendant, which led to the officer having defendant exit the vehicle, searching defendant's pockets, calling a backup officer, explaining the situation to the new officer, requesting *370 that the new officer complete the warning ticket, and finally getting the canine from the patrol vehicle and conducting the sniff test. While this string of events may have only extended the stop for minutes, the stop was nonetheless extended beyond the amount of time required to reasonably complete the stop's mission. I am of the impression that the time it took for the officer to complete the traffic-based inquiries of checking defendant's license and registration constituted the reasonable amount of time for the stop-any holdover thereafter was unreasonable because the officer lacked reasonable suspicion. I recognize that past precedent has held that any delay in this case was de minimis. However, in light of the Supreme Court's holding in Rodriguez, we are no longer bound to follow the de minimis rule.
Because the officer had (1) finished completing the traffic-based inquiries of checking defendant's license and registration, (2) was in the middle of issuing the warning ticket, and (3) the additional time defendant was detained was used to conduct a check that was unrelated to the officer's otherwise lawful traffic stop, I am of the opinion that the officer unreasonably extend the duration of the stop in order to conduct a canine sniff of the outside of defendant's vehicle. Further, by prolonging the traffic stop, defendant's Fourth Amendment rights were violated. Therefore, I conclude that the trial court erred in denying defendant's motion to suppress evidence.